**MAYOR AND COUNCIL OF the BOROUGH OF ROCKAWAY, a municipal corporation of the State of New Jersey, Plaintiff,**

**v.**

**KLOCKNER & KLOCKNER, a partnership, Multi–Form Metals, Inc., Masden Industries, Inc., Thiokol Corporation, Inc., Roned Realty Company, XYZ, Inc., ABC Co., and John Doe, Defendants.**

**KLOCKNER & KLOCKNER, Third Party Plaintiff,**

**v.**

**E. Carl FABEND, individually, and Joseph A. Mauriello, individually, Third Party Defendants.**

Civ. A. No. 91–4842.

United States District Court, D. New Jersey.

Jan. 26, 1993.

Archer & Greiner, Edward C. Laird, Christopher R. Gibson, Haddonfield, NJ, for Thiokol Corp., Inc.

Riker, Danzig, Scherer, Hyland & Perretti, Dennis J. Krumholz, Morristown, NJ, for Klockner & Klockner.

Goldshore, Wolf & Lewis, Lewis Goldshore, Robert J. Cash, Lawrenceville, NJ, for Mayor and Council of Borough of Rockaway.

Maraziti Falcon & Gregory, Diane Alexander, Morristown, NJ, for Masden Industries, Inc. and Multi–Form Metals, Inc.

## OPINION

HAROLD A. ACKERMAN, District Judge:

This matter comes before the court on the motions of defendant Thiokol Corporation ("Thiokol") to dismiss in part the Complaint of plaintiff Mayor and Council of the Borough of Rockaway ("Rockaway"), and to dismiss in part the Cross-claim of defendant Klockner & Klockner ("Klockner") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

### I. Background

This action arises out of the alleged contamination of water supply wells and groundwater resources located within the Borough of Rockaway, Morris County, New Jersey.

According to the Complaint, in March 1980, analysis of water from three of Rockaway's drinking supply wells indicated the presence of volatile organic compounds, including trichloroethylene ("TCE") and tetrachloroethylene ("PCE"), in the municipal well field. To address this situation, Rockaway constructed a three-bed, granular activated carbon absorption treatment system ("treatment system") to treat the water pumped from the municipal wells. The treatment system has been in operation since that time.

In December 1982, the United States Environmental Protection Agency ("EPA") designated the Rockaway Borough Well Field site as a Superfund Site and placed it on the National Priority List ("NPL") of Superfund Sites pursuant to CERCLA. In January 1984, the New Jersey Department of Environmental Protection ("DEP")[1] initiated a Remedial Investigation/Feasibility Study of the well field contamination. The result of the investigation, issued in August 1986, suggested general areas in Rockaway that could be contributing to the contamination, but failed to specify responsible parties. The study recommended further investigation.

In September 1986, the EPA Regional Administrator issued a Record of Decision ("ROD") which indicated that the treatment system implemented by Rockaway was the appropriate remedy. In January 1990, the EPA released a report which identified certain properties as the sources of the groundwater contamination. The properties identified were those of defendants Klockner and Roned Realty Company ("Roned"). On July 18, 1991, the EPA issued a subsequent Remedial Investigation/Feasibility Study for the Well Field Site which confirmed that the appropriate remedy was the existing treatment system. On the same day, the EPA issued a Notice of Potential Liability letter to a number of parties deemed to be potentially responsible for the contamination of the Well Field, including defendants Klockner, Thiokol,

---

1. The DEP is the predecessor of the New Jersey Department of Environmental Protection and Energy ("DEPE").

Multi–Form Metals, Inc. ("Multi–Form"), and Roned. On August 2, 1991, the EPA confirmed again that the treatment system implemented by Rockaway was the appropriate remedy. On September 30, 1991, the EPA issued another ROD which selected a remedial alternative for the Borough Well Field.

On October 31, 1991, Rockaway filed a Complaint in this court seeking response costs, natural resource damages and injunctive relief under a variety of legal theories. Specifically, the Complaint sets forth the following nine counts for relief: Count I (claim for response costs under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.*, ("CERCLA")); Count II (claim for natural resource damages under CERCLA); Count III (strict liability); Count IV (claim under the Spill Compensation and Control Act, N.J.S.A. 58:10–23.11, *et seq.*, ("Spill Act")); Count V (private and public nuisance); Count VI (trespass); Count VII (tortious contamination); Count VIII (tortious failure to remediate contamination); and Count IX (claim under the Environmental Rights Act, N.J.S.A. 2A:35A–1, *et seq.* ("ERA")). Thiokol seeks to dismiss Count I to the extent it seeks injunctive relief, Count II, and Counts IV through IX.[2]

On December 10, 1991, defendant Klockner filed an Answer and Cross-claim against the other defendants Multi–Form, Masden, Thiokol, Roned, XYZ Corp., ABC Co. and John Doe.[3] According to the Cross-claim, Thiokol leased certain property from Klockner (the "Property") from 1949 until 1970, using the premises for the manufacture of missiles. Klockner alleges that as part of the manufacturing process, Thiokol used large quantities of cutting oils, coolants and degreasing solution, which allegedly contain TCE and other contaminants. Klockner further alleges that

these chemicals were stored in underground storage tanks located beneath the Property, and that hazardous substances were discharged into the soil and groundwater during the course of the leasehold. According to the Cross-claim, when Thiokol vacated the premises in 1970, it failed to clean up the alleged contamination and failed to disclose the pollution to Klockner.

In 1985, Klockner entered into an agreement to sell the Property. Because the Property was used for industrial purposes, the contemplated sale triggered the provisions of New Jersey's Environmental Cleanup Responsibility Act ("ECRA"), N.J.S.A. 13:1K–6, *et seq.*[4] In an effort to comply with ECRA, and thus consummate the sale, Klockner initiated an investigation of the extent of contamination on the Property. Klockner removed the underground storage tanks utilized by Thiokol and installed monitoring wells. Klockner alleges that the investigation revealed the presence of TCE and other contaminants in the soil and groundwater. Klockner, however, never completed cleanup measures at the Property nor consummated the sale.

Klockner then brought this Cross-claim for contribution and indemnification against the other defendants, setting forth twenty claims for recovery. Thiokol has moved to dismiss the following eleven counts: Count II (Spill Act); Count III (New Jersey Solid Waste Management Act, N.J.S.A. 13:1E–1, *et seq.* ("Solid Waste Management Act")); Count IV (New Jersey Water Pollution Control Act, N.J.S.A. 58:10A–1, *et seq.* ("Water Pollution Control Act")); Count V (private nuisance); Count VI (public nuisance); Count VIII (negligence); Count X (fraudulent concealment); Count XVI (waste of property); Count XVII (trespass); Count XVIII (restitution and unjust enrichment); and Count XX (common law contribution).

---

**2.** Defendants Masden Industries, Inc. ("Masden") and Multi–Form have joined Thiokol in its motion to dismiss in part the Complaint as to Counts I, IV, V, VI, VII, VIII and IX. They are not moving to dismiss Count II.

**3.** On March 11, 1992, Klockner filed its First Amended Cross-claim, which is identical to the

original Cross-claim except that it adds two new counts.

**4.** ECRA requires an investigation and remediation of any pollution located on industrial property before the property can be sold or otherwise transferred.

The parties appeared before this court for oral argument on the instant motions on May 14, 1992, at which time I reserved decision. For the following reasons, Thiokol's motions to dismiss are granted in part and denied in part.

## II. Discussion

### A. Standard on Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of a complaint, or a count therein, for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). When reviewing the efficacy of a complaint under this rule, I "must accept as true all well-pleaded allegations of the complaint, and construe them in the light most favorable to the plaintiff; ... dismissal may [result] only if the plaintiff alleges no set of facts which, if proved, would entitle him or her to relief." *Marshall–Silver Constr. Co. v. Mendel,* 894 F.2d 593, 595 (3d Cir.1990); *accord Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Rogin v. Bensalem Township,* 616 F.2d 680, 685 (3d Cir.1980), *cert. denied sub nom. Mark Garner Assoc., Inc. v. Bensalem Township,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981).

I will now consider each of the counts sought to be dismissed in turn.

### B. Motion to Dismiss Rockaway's Complaint

#### 1. *Claim for Injunctive Relief under CERCLA*

CERCLA, enacted in 1980 and amended in 1986, is directed at the cleanup of hazardous waste disposal sites. Count I of the Complaint is brought under Section 107 of CERCLA, which permits the recovery of certain costs of clean-up from responsible parties. *See* 42 U.S.C. § 9607. Specifically, Section 107 provides that re-sponsible parties, such as owners and operators of facilities at which hazardous substances have been discharged, may be liable for:

(A) all costs of removal or remedial action[5] incurred by the United States Government or a State ... not inconsistent with the national contingency plan;[6]

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(4)(A)–(a)(4)(D).

In the Complaint, Rockaway alleges that it has incurred and will continue to incur response costs that are consistent with the national contingency plan ("NCP") with respect to contamination at the Rockaway Well Field and the groundwater aquifer. Compl. at ¶ 48. It further alleges that defendants Thiokol, Masden and Multi–Form are "operators" at the facility which has released hazardous substances into the groundwater aquifer, and are jointly and severally liable for all costs of removal and remedial action. Compl. at ¶¶ 50, 52. In its prayer for relief, Rockaway requests, *inter alia,* that the court issue:

a mandatory injunction to compel the Defendants to comply with their obligations under CERCLA to take all removal and remedial actions necessitated by the release or threatened release of hazardous substances impacting, or likely to impact, the Borough well field....

---

**5.** "Removal" actions are short-term emergency responses to toxic waste hazards; "remedial" actions are intended to provide long-term solutions. *See Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988).

**6.** The national contingency plan ("NCP") was created under section 105 of CERCLA and promulgated at 40 C.F.R. § 300.1, *et seq.* The NCP establishes procedures and standards for responding to releases of hazardous substances and sets forth criteria for evaluating the appropriateness and effectiveness of response measures. 42 U.S.C. § 9605.

Thiokol urges the court to dismiss this count to the extent it seeks an injunction on the ground that only the EPA is authorized to obtain injunctive relief under CERCLA.

Section 107 by its terms does not provide for injunctive relief. Rather, it provides only for the recovery of damages as set forth in subsections (4)(A) through (C).

In contrast, Section 106 expressly authorizes injunctive relief. This section provides in pertinent part:

> when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.

42 U.S.C. § 9606(a). Thus, Section 106(a) authorizes the President, acting through the EPA, to seek an injunction to force a responsible party to clean up any site or spill that presents an "imminent and substantial" danger to public health or welfare or the environment. Section 106 does not confer this same authority upon private citizens.

The Second Circuit, in a carefully reasoned opinion, held that injunctive relief was not available to the plaintiff, the State of New York, under Section 107. *See New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985). The Court determined that the statutory scheme demonstrates a congressional intent not to authorize such injunctive relief. It reasoned:

> Section [106] expressly authorizes EPA to seek injunctive relief to abate "an actual or threatened release of a hazardous substance from a facility." Implying the authority to seek injunctions under section [107] would make the express

injunctive authority granted in section [106] surplusage.

759 F.2d at 1049.

The Court also reasoned that the scope of injunctive relief under section 107 would conflict with the express scope of section 106 because the standard for seeking abatement under section 106 is narrower than the standard of liability under section 107. Section 106 authorizes injunctive relief only where the EPA "determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment." In contrast, Section 107 contains no such limitation. *Id.; see also Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 840 F.2d 691, 697 (9th Cir.1988) ("to allow parties entitled to damages under section 107(a) to seek injunctive relief under that section would enable such parties to bypass the specific limitations on the President's authority to seek injunctive relief described in section 106(a)").

The Second Circuit also found support for its holding in the legislative history of CERCLA. *See Shore Realty*, 759 F.2d at 1049–50. Earlier versions of CERCLA granted authority to seek injunctive relief to both the President and the states. In contrast, the compromise version of CERCLA that was finally enacted gives that power to the President only. *Id.*

The conclusion that injunctive relief is not available under Section 107 is supported by the overwhelming weight of authority. *See, e.g., Cadillac*, 840 F.2d at 697 ("Congress did not intend to create a private cause of action for injunctive relief under CERCLA"); *United States v. Cannons Eng'g Corp.*, 720 F.Supp. 1027, 1052 (D.Mass.1989) ("Under CERCLA, injunctive relief is available only to the United States."), *aff'd*, 899 F.2d 79 (1st Cir.1990); *Utah State Dep't of Health v. Ng*, 649 F.Supp. 1102, 1106 (D.Utah 1986) (dismissing CERCLA claim of state department to the extent it requested injunctive relief); *Velsicol Chem. Corp. v. Reilly Tar & Chem. Corp.*, 21 Env't Rep.Cas. (BNA) 2118, 2121 (E.D.Tenn.1984) (dismissing CERCLA claim of private plaintiff for in-

junctive relief); *see also McGregor v. Industrial Excess Landfill, Inc.,* 709 F.Supp. 1401, 1409 (N.D.Ohio 1987) (only Attorney General, through EPA, has authority to seek injunctive relief under Section 106), *aff'd,* 856 F.2d 39 (6th Cir.1988).

█ Rockaway contends, however, that injunctive relief is available to a CERCLA plaintiff pursuant to the inherent equitable powers of the court. It relies on *Califano v. Yamasaki,* which held that "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." 442 U.S. 682, 705, 99 S.Ct. 2545, 2559, 61 L.Ed.2d 176 (1979). Rockaway reasons that because nothing in CERCLA expressly prohibits issuance of injunctive relief under Section 107, the court has the equitable power to do so. I disagree. Based on an analysis of the statutory scheme of CERCLA and its legislative history, I find that Congress has clearly indicated its intent to limit injunctive relief to the federal government. *See Utah State Dep't,* 649 F.Supp. at 1106 ("Congress *expressly and inescapably* limited injunctive power under the statute to the President") (emphasis added); *see also Colorado v. Idarado Mining Co.,* 916 F.2d 1486, 1497 (10th Cir.1990) (in action for injunctive relief under Section 121, application of court's equitable power held inappropriate because CERCLA carefully limits injunctive relief as a remedy), *cert. denied,* ─── U.S. ───, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991).

Rockaway also relies on the decision of my colleague, Judge Wolin, in *T & E Indus., Inc. v. Safety Light Corp.,* 680 F.Supp. 696 (D.N.J.1988), for the proposition that injunctive relief is available under Section 107. I do not read Judge Wolin's decision, however, as supporting Rockaway's position. In *T & E,* Judge Wolin did not dismiss the plaintiff's claim for injunctive relief under CERCLA. The plaintiff in *T & E,* however, was seeking an injunction *to enforce a potential judgment for response costs.*

In its analysis, the Court first acknowledged that "CERCLA does not provide a private party with the right to injunctive relief requiring cleanup of a hazardous waste site...." *Id.* at 704. The Court went on to note that a court does not need statutory authorization to grant injunctive relief and that absent a clear command from Congress, courts retain their inherent power to issue injunctive relief. With regard to CERCLA, however, the Court simply held that it may issue injunctive relief requiring payment of response costs. Judge Wolin stated:

> while this Court acknowledges the fact that CERCLA does not provide private litigants with a cause of action by which they may require others to clean up hazardous sites, it nevertheless does not prohibit *other forms of injunctive relief* to private litigants. Other forms of injunctive relief could be granted to compel defendants to "comply with their obligations," *which may be limited to simply reimbursing plaintiff for "necessary costs."*

*Id.* at 705 (emphasis added).

Thus, Judge Wolin essentially found that while a court is precluded from issuing an injunction requiring clean-up of a waste site, it can issue an injunction compelling payment of response costs. Here, Rockaway seeks an injunction compelling defendants to clean up the Borough Well Field. *T & E* is therefore of no avail to Rockaway. Rockaway's claim for injunctive relief under CERCLA fails to state a claim for relief and therefore will be dismissed.

### 2. *Claim for Natural Resource Damages under CERCLA*

█ Count II of the Complaint is asserted under Section 107(f)(1) of CERCLA. Section 107(f)(1) essentially elaborates on the recovery of natural resource damages as provided for under Section 107(a)(4)(C). As noted above, Section 107(a)(4)(C) permits recovery of "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a)(4)(C). Section 107(f)(1) provides:

> In the case of an injury to, destruction of, or loss of natural resources under

[107(a)(4)(C) ] *liability shall be to the United States Government and to any State* for natural resources within the State or belonging to, managed by, controlled by or appertaining to such State....

42 U.S.C. § 9607(f)(1) (emphasis added). Section 107(f)(1) further provides:

*The President, or the authorized representative of any State,* shall act on behalf of the public as trustee of such natural resources to recover for such damages.

*Id.* (emphasis added).

In its Complaint, Rockaway alleges that it is an authorized representative of the state of New Jersey and is therefore entitled to commence a natural resource damage action under Section 107(a)(4)(C) of CERCLA. Compl. ¶ 56.

Thiokol contends that Rockaway is not an authorized representative of the State within the meaning of Section 107(f)(1), and that therefore it does not have standing to maintain an action for natural resource damages, mandating dismissal of this count.

Seven years ago, I had occasion to decide the question of whether a municipality is a "state" for purposes of recovery under Section 107(a)(4)(A) and (C). *See Mayor and Board of Aldermen of Town of Boonton v. Drew Chem. Corp.,* 621 F.Supp. 663 (D.N.J.1985). In *Boonton,* I held that governmental subdivisions, such as municipalities, are encompassed within the meaning of "state" under Section 107(a)(4)(C). In reaching this decision, I observed that the definition of "state" in CERCLA, while not expressly mentioning local governments, was not an inclusive definition. I therefore deemed it appropriate to expand the list of entities set forth in the definition of "state" in order to effectuate the remedial purpose of the statute. *Id.* at 666. I further observed that the definition of "natural resources" included natural resources belonging to local governments, and that it would therefore be anomalous to deny relief under Section 107 to local governments when natural resources owned by local governments are expressly included within the protected coverage of Section 107(a)(4)(C). *Id.* In addition, noting that the phrase "authorized representative of the State" as used in Section 107(f) was not defined in CERCLA, I looked to state law for guidance, which grants municipalities broad powers over matters of local concern. *Id.* at 667–68. Based on these reasons, I held that a municipality is a "state" within the meaning of Section 107(a)(4)(A) and (C), or alternatively, that a municipality is an "authorized representative of a state" under Section 107(f), entitled to bring an action for natural resource damages. *See also City of New York v. Exxon Corp.,* 633 F.Supp. 609, 619 (S.D.N.Y.1986) (rejecting argument that city cannot bring action for natural resource damages under Section 107(a)(4)(C)).

More recently, Judge Ditter of the Eastern District of Pennsylvania had occasion to address this same issue. *See City of Philadelphia v. Stepan Chem. Co.,* 713 F.Supp. 1484 (E.D.Pa.1989).[7] Relying primarily on the plain meaning of the statute, Judge Ditter held that the term "state" does not include "municipality," stating "I cannot construe section 107(a)(4)(A) to allow a municipality to proceed as a state when there is no support in either the statutory language or the legislative history of CERCLA for such a result." *Id.* at 1488. Judge Ditter examined the definition of "state" contained in CERCLA and concluded that the entities included within the definition—the District of Columbia, Puerto Rico, Guam, Samoa, the Virgin Islands, the Marinas, and United States territories and possessions—"differ so vastly from villages, towns, boroughs, townships, counties, and cities as to be words of exclusion." *Id.* Moreover, in other sections of CERCLA, Congress explicitly uses terms such as "municipalities," "local governments," and "political subdivisions," *see, e.g.,* 42 U.S.C. § 9601(21) ("person" defined as including a

---

7. Although *Stepan* dealt only with the recovery of response costs under Section 107(a)(4)(A), the Court's analysis is equally applicable to the definition of "state" within the meaning of Section 107(a)(4)(C).

municipality and political subdivisions of a state), suggesting "both that the omission of municipalities from the definition of 'state' was not accidental and that Congress had no intention of implicitly including municipalities within the word 'state'." *Stepan,* 713 F.Supp. at 1489. Judge Ditter was also unable to find any support in the legislative history for the proposition that "state" should include its governmental subdivisions for purposes of recovery under Section 107(a)(4)(A), and therefore deemed the unambiguous statutory language conclusive. *Id.*

Having re-examined this issue and having taken into consideration recent amendments to CERCLA, I am convinced that the approach of Judge Ditter is the better one. I am, therefore, constrained to retreat from my earlier decision in *Boonton.*

While CERCLA is indeed a "far-reaching remedial statute," *Boonton,* 621 F.Supp. at 666, its legislative history also "suggests a concern on the part of Congress that unwise and excessive clean-up activity be restrained." *Stepan,* 713 F.Supp. at 1488 n. 12. Accordingly, with respect to access to remedies and burdens of proof, CERCLA clearly differentiates between the United States and the states, on the one hand, and any other person, on the other. *See Town of Bedford v. Raytheon Co.,* 755 F.Supp. 469, 470 (D.Mass.1991). For example, in an action brought by the federal government or a state to recover response costs under Section 107(a)(4)(A), there is a presumption that the removal or remedial actions were consistent with the NCP. The defendant has the burden of demonstrating that they were inconsistent. In contrast, in an action brought by "any other person" for response costs under Section 107(a)(4)(B), there is no such presumption. Rather, the plaintiff has the burden of demonstrating that its clean-up activities were consistent with the NCP in order to recover response costs. *Id.* at 472. This suggests that when Congress enacted CERCLA, it differentiated between the federal and state governments and any other person with regard to access to remedies, and thus could have intended to limit the right of recovery for natural resource damages to the United States and the states.

This conclusion is confirmed by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). SARA clarifies who may bring an action as trustee to recover for natural resource damages. Section 107(f)(2)(B) provides:

> The Governor of each State *shall* designate *State officials* who may act on behalf of the public as trustees for natural resources under this chapter....

42 U.S.C. § 9607(f)(2)(B). Thus, only a "state official," specifically appointed by the governor of the state, may be an "authorized representative" for purposes of bringing an action to recover for natural resource damages. SARA thus confirms Congress' intent that Section 107(f) inure only to the benefit of the states and not their political subdivisions.[8]

The conclusion that Congress deliberately chose to centralize decisions regarding natural resources is supported by other considerations:

> The decision to centralize in the Government responsibility for designating state natural resource trustees is consistent with a more general concern, even apart from CERCLA, that the claims of municipalities relating to natural resources, which are typically of regional concern, not be subject to the parochial views of a state's political subdivision.

\* \* \* \* \* \*

The Congressional determination to require the Chief Executive of the sovereign to designate the trustee to pursue such a claim represents an understandable preference that litigation strategy and settlement decisions be centralized in this developing area to avoid a proliferation of inconsistent approaches by a

---

**8.** Although *Bedford* suggests that municipalities may now, under appropriate circumstances, seek designation as a "natural resource trustee," it also observed that nothing in SARA "suggests that municipalities are entitled to such an appointment merely because of their municipal status or their relationship to the natural resource." 755 F.Supp. at 473.

range of different plaintiffs with counsel of variable quality and experience.

*Bedford*, 755 F.Supp. at 473.

■ Thus, to the extent that it was unclear prior to SARA, SARA eliminates any question of whether a municipality, such as Rockaway, can proceed under Section 107(f). Clearly, Rockaway is not a "state official," despite its contention that it is a "public official." [9] In any event, Rockaway has not been designated as trustee by the Governor of New Jersey. Rather, the New Jersey DEP was designated as New Jersey's "Natural Resource Trustee" pursuant to Executive Order No. 192, which was signed by former Governor Thomas H. Kean on September 14, 1988. Therefore, only the DEP may bring an action under Section 107(a)(4)(C) to recover natural resource damages.

Rockaway sets forth several arguments contending that it may maintain an action for natural resource damages. First, it questions the continuing validity of an Executive Order after the expiration of the term of the governor who signed the order. However, it cites no authority to support this contention and does not proffer any reason why the Executive Order should no longer be given effect.

Next, it notes that "the constitutional powers of the Governor do not support what essentially would be a legislative act by the chief executive." Plaintiff's Br. at 8. Rockaway fails to explain, however, how the appointment of a state official as trustee, as expressly authorized by Congress, amounts to a "legislative act." SARA authorized the Governor to make an appointment only, which is plainly an executive decision.

Rockaway also questions whether a governor can "diminish the historical powers

which municipalities have exercised, pursuant to legislative enactments, over local resources..." *Id.*[10] As a preliminary matter, I fail to see how the appointment of the DEP to bring certain actions under CERCLA *a fortiori* diminishes the power of municipalities. Merely providing a new cause of action to certain entities, but not to others, does not necessarily take away or diminish powers otherwise enjoyed by those other entities.

Assuming that SARA somehow does limit the powers of municipalities, Rockaway argues that under state law, local governments are given broad powers to govern the public safety and welfare, *see* Home Rule Act of 1914, N.J.S.A. 40:48–1, *et seq.*, and that "the Governor is powerless to essentially disenfranchise the municipality by proclamation." Plaintiff's Br. at 9. As noted above, however, Congress has explicitly authorized the Governor to appoint *state* officials to be trustees. As became clear during oral argument, Rockaway is essentially making a Tenth Amendment argument. It contends that the statute cannot be read as permitting the Governor to overturn the authority granted to municipalities under state law because that would constitute an impermissible interference with the sovereignty of the State. Rockaway cites no authority for this proposition, however. The court notes that federal environmental legislation is generally upheld over Tenth Amendment challenges. *See, e.g., Hodel v. Virginia Surface Mining & Reclamation Assoc.*, 452 U.S. 264, 291, 101 S.Ct. 2352, 2368, 69 L.Ed.2d 1 (1981) (Congress does not violate Tenth Amendment "simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers.").

**9.** Rockaway contends that it is a "public official," suggesting that this is somehow comparable to a "state official." I find this contention to be without merit.

**10.** Although in *Boonton* I found state law to be of "some value" in determining who an "authorized representative" is under Section 107, I did so because the term was not defined in CERCLA. Even then, I noted that I was "not con-

vinced that Congress intended state law to govern the question of who or what is an 'authorized representative' under CERCLA." *Boonton,* 621 F.Supp. at 667. The enactment of SARA following *Boonton* demonstrates Congress' intention that the appropriate representative of the state is a "State official" appointed by the governor. I therefore find state law regarding this matter to be of little relevance.

I therefore find that Rockaway lacks standing to bring an action under Section 107(a)(4)(C). Count II, therefore, fails to state a claim for relief and must be dismissed.

### 3. *Claim under New Jersey Spill Act*

■ Count IV is brought under the New Jersey Spill Act, N.J.S.A. 58:10–23.11, *et seq.* The Complaint alleges that defendants discharged hazardous substances into the soil and groundwater within Rockaway, injuring the groundwater aquifer and necessitating the expenditure of "substantial public funds" to clean up and remove the hazardous substances. Compl. at ¶¶ 62–63.

Thiokol argues that the Spill Act does not provide a private plaintiff with a cause of action for damages, citing *Jersey City Redevelopment Auth. v. PPG Indus.*, 655 F.Supp. 1257 (D.N.J.1987), *aff'd*, 866 F.2d 1410, 1411 (3d Cir.1988); *T & E*, 680 F.Supp. 696; and *Allied Corp. v. Frola*, 701 F.Supp. 1084 (D.N.J.1988).

At the time these cases were decided, Section 8(c) of the Spill Act provided as follows:

[A]ny person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing pursuant to subsection b. of Section 7[11] of this act shall be strictly liable, jointly and severally, without regard to fault, for all clean up and removal costs.

N.J.S.A. 58:10–23.11g.c. Relying on the statutory language of Sections 7[12] and 8 of the Spill Act, these cases held that Section 8(c) permits the New Jersey DEP to recover its clean-up costs from responsible parties, but that it does not provide a private cause of action for the recovery of clean-up costs against other private parties. *See T & E*, 680 F.Supp. at 703; *Frola*, 701 F.Supp. at 1091; *PPG*, 655 F.Supp. at 1262–63.

However, as the parties recognized after they filed their briefs in this matter, Section 8(c) was significantly amended in 1991. Section 8(c) now provides in pertinent part:

Any person who has discharged a hazardous substance, or is any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs *no matter by whom incurred.* Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to [Section 7(b)].

N.J.S.A. 58:10–23.11g.c(1). (emphasis added).

Regardless of whether a private right of action existed under the Spill Act prior to the amendment, I find that the statutory language, as amended, clearly states an intent to provide a cause of action to private plaintiffs. The plain meaning of the language is that dischargers are liable for costs of clean-up, regardless of who has incurred those costs.

This interpretation of the statute is supported by Section 7(a)(3) of the Spill Act, which expressly permits removal and clean up operations "by any person" threatened by a release of hazardous substances. N.J.S.A. 58:10–23.11f.a(3). It is also supported by Section 20, which provides that:

Any claims for costs of cleanup, civil penalties or damages by the State, and any claim for damages *by any injured person*, may be brought directly against the bond, insurer, or any other person providing evidence of financial responsibility.

N.J.S.A. 58:10–23.11s. (emphasis added). It would certainly be anomalous, to say the least, for the statute to permit a claim for damages "by any injured person" directly against the insurer of the discharger, but not against the discharger itself.[13] Finally,

---

**11.** Section 7(b) authorized the DEP only to remove hazardous substances which have not been discharged. *See* N.J.S.A. 58:10–23.11f.b.

**12.** Section 7 expressly authorizes the DEP to take action to clean up and remove discharges of hazardous substances. N.J.S.A. 58:10–23.11f.

**13.** Moreover, the definition of "cleanup and removal costs" includes costs incurred by the

the Spill Act itself mandates a liberal construction of its provisions. *Superior Air Prods. Co. v. NL Indus., Inc.*, 216 N.J.Super. 46, 60, 522 A.2d 1025 (App.Div.1987); N.J.S.A. 58:10–23.11v.

■ Thiokol argues, however, that despite the amended language, the Spill Act does not provide a private right of action, relying primarily on the existence of the New Jersey Compensation Fund (the "Fund"). *See* N.J.S.A. 58:10–23.11i. The Fund was created pursuant to the Spill Act to provide compensation to persons damaged by the discharge of hazardous substances. N.J.S.A. 58:10–23.11a. Pursuant to Section 8(a), the Fund is strictly liable for all cleanup and removal costs and all damages no matter by whom sustained. N.J.S.A. 58:10–23.11g.a. If the Fund expends money, it may recover its clean-up costs from the responsible party. In addition, the Spill Act authorizes the DEP to withdraw money directly from the Fund when it undertakes clean-up measures; everyone else must file a claim with the Fund for reimbursement of clean-up costs. *See* N.J.S.A. 58:10–23.11k.

According to Thiokol, the main purpose of the amendment to Section 8(c) was to provide "local units" [14] with a more expeditious mechanism for the reimbursement of monies from the Fund which it has expended in connection with an "emergency response action" taken pursuant to Section 7(b). Section 7(b) authorizes a local unit to clean up hazardous substances that have not been discharged, as part of an emergency response action. N.J.S.A. 58:10–23.11f.b. According to Thiokol, amended Section 8(c) now permits a local unit to file a direct claim against the Fund for the costs it incurred pursuant to Section 7(b). This differs from the ordinary claims procedure under N.J.S.A. 58:10–23.11k. Assuming this analysis is correct, it only applies to one part of amended Section 8(c). Specifi-

cally, it applies to the second sentence of Section 8(c), which specifically refers to costs incurred under Section 7(b).

The newly amended section also provides, however—in the first sentence—that any responsible person is liable for *all* cleanup and removal costs, "no matter by whom incurred." Thiokol apparently reads this language merely as giving *the Fund* a right of action against responsible parties after it has reimbursed the DEP or any other person for clean-up costs. In other words, according to Thiokol, Section 8(c) merely provides that responsible persons are liable *to the Fund* only. I find this interpretation of Section 8(c) to be strained. The language of Section 8(c) contains no such limitation. Moreover, Thiokol does not explain why the existence of the Fund should preclude a private action under the Spill Act, particularly where such a result is not apparent from the language of the statute. The Fund was created to provide for "swift and adequate compensation to resort [sic] businesses and other persons damaged by" the discharge of hazardous substances. N.J.S.A. 58:10–23.11a. The existence of a mechanism for prompt payment of clean-up costs, however, does not in and of itself undermine a private right of action under the Spill Act.[15] Although Section 8(c) has been interpreted, prior to the amendment, as allowing *the Fund* to recover response costs from responsible parties after the Fund has reimbursed the DEP for its costs, *see PPG*, 655 F.Supp. at 1263, it has not been held that *only* the Fund can bring an action against a discharger. Indeed, it is undisputed that Section 8(c) permits a direct action by the DEP against responsible parties. *See Frola*, 701 F.Supp. at 1091 (*citing New Jersey Department of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150 (1983)).

State, its political subdivisions, its agents, or any person with written approval from the DEP. N.J.S.A. 58:10–23.11b.d.

**14.** The definition of "local units" includes counties and municipalities. N.J.S.A. 58:10–23.11b.x.

**15.** This interpretation is supported by the fact that the Spill Act provides that upon payment of a claim, the Fund is "subrogated" to the rights of the claimant against the responsible party, N.J.S.A. 58:10–23.11q, thus suggesting the existence of a direct cause of action against the discharger.

I find that the Spill Act, as amended, permits a private cause of action against responsible parties to recover clean-up costs. Count IV states a claim for relief and will therefore not be dismissed.

4. *Claims for Private and Public Nuisance, Trespass, Tortious Contamination, and Tortious Failure to Remediate Contamination*

Counts V through VIII allege claims for private and public nuisance, trespass, tortious contamination, and tortious failure to remediate contamination. Thiokol has moved to dismiss these counts on the sole ground that these counts "parrot" Count III of the Complaint, which asserts a claim based on strict liability. Specifically, Count III alleges that defendants were engaged in or responsible for abnormally dangerous or ultrahazardous activities and are therefore strictly liable for all damages resulting from their conduct. Compl. ¶¶ 59–60.

Thiokol essentially argues that the relief sought in Counts V through VIII (damages and injunctive relief) is identical to that sought in Count III, and that this warrants dismissal of Counts V through VIII.

I disagree. Dismissal under Rule 12(b)(6) is warranted only where the plaintiff has failed to allege any set of facts which, if proved, would entitle it to relief. *See Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593, 595 (3d Cir.1990). Thiokol does not take this position. Rather, it argues that because the remedy Rockaway seeks is available under Count III, all other counts seeking the same remedy must be dismissed. Thiokol cites no authority for the unusual proposition that a party cannot assert more than one cause of action or legal theory which seek the same remedy. Indeed, Rule 8 of the Federal Rules of Civil Procedure expressly permits a party to assert any and all alternative claims it may have. *See* Fed.R.Civ.P. 8(e)(2); Wright & Miller, 5 *Federal Practice and Procedure*, § 1282. Although Rockaway may not obtain duplicative recovery, there is no bar to the assertion of different legal theories of recovery even if they seek the same remedy or are based on the same factual predicate. The two cases cited by Thiokol in support of its argument, *PPG*, 655 F.Supp. 1257 and *Kenney v. Scientific, Inc.*, 204 N.J.Super. 228, 497 A.2d 1310 (Law Div. 1985), involved summary judgment motions and are therefore not on point.

Moreover, the fact that the causes of action seek the same relief and involve the same factual predicate does not automatically make the causes of action duplicative. The elements of a strict liability claim differ from the elements of other tort claims such as nuisance and trespass. *See e.g., T & E Indus. v. Safety Light Co.*, 123 N.J. 371, 390, 587 A.2d 1249 (1991) (listing elements of strict liability); *PPG*, 655 F.Supp. at 1264–65 (listing elements of nuisance). 'It would be inappropriate at this early stage in the litigation to deprive Rockaway of the opportunity to pursue common law claims which do not require the showing necessary under a strict liability claim.

This court recognizes that New Jersey courts have moved toward a strict liability theory with respect to environmental pollution cases and away from such common law claims as trespass and nuisance. *See Ventron*, 94 N.J. at 492–93, 468 A.2d 150; *Kenney*, 204 N.J.Super. at 255–56, 497 A.2d 1310. Thus, dismissal of certain claims may very well be appropriate at a later stage in the litigation. I decline to do so, however, at the very outset. Thiokol's motion to dismiss Counts V through VIII is denied.

5. *Claim under ERA*

Count IX of the Complaint is brought pursuant to the Environmental Rights Act ("ERA"), N.J.S.A. 2A:35A–1, *et seq.* This count alleges that the ERA empowers Rockaway to bring an action "to prevent environmental degradation and ensure the enforcement of anti-pollution law within the State of New Jersey." Compl. at ¶ 81. It further alleges that defendants have discharged or are responsible for discharging hazardous substances and injuring the groundwater aquifer within Rockaway. Compl. ¶¶ 79–80. Rockaway seeks injunctive relief restraining defendants from further discharging hazardous sub-

stances and requiring defendants to remediate any contamination caused by the hazardous substances for which defendants are responsible.

Section 4(a) of the ERA provides:

Any person may maintain an action ... to enforce, or to restrain the violation of, any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment.

N.J.S.A. 2A:35A–4(a). Section 4(b) provides:

Any person may maintain an action ... for declaratory and equitable relief ... for the protection of the environment, or the interest of the public therein, from pollution, impairment or destruction.

N.J.S.A. 2A:35A–4(b).

■■■ The ERA does not itself confer any substantive rights. *Superior*, 216 N.J.Super. at 58, 522 A.2d 1025. Rather, it grants private plaintiffs standing to enforce other New Jersey environmental statutes "as an alternative to inaction by the government which retains primary prosecutorial responsibility." *Id.* The government is "entrusted initially with the right to determine the primary course of action to be taken." *Howell Township v. Waste Disposal, Inc.*, 207 N.J.Super. 80, 95, 504 A.2d 19 (App.Div.1986). However, where the government has "failed or neglected to act in the best interest of the citizenry or has arbitrarily, capriciously or unreasonably acted," a private plaintiff can bring an action under the ERA. *Id.* at 96. Thus, the primary goal of the ERA is to limit lawsuits by private litigants to those instances where the government has not acted. *Superior*, 216 N.J.Super. at 58–59, 522 A.2d 1025; *Allied Corp. v. Frola*, 730 F.Supp. 626, 636 (D.N.J.1990) (aim of ERA is to correct governmental inaction).

Thiokol argues that Rockaway has failed to allege that the government failed to act or that its actions have been "arbitrary capricious and unreasonable" and that this warrants dismissal of the Count. I disagree. Thiokol has not cited any authority for the proposition that a plaintiff must specifically plead that the government has failed to act or that, if the government has acted, that its actions have been "arbitrary, capricious and unreasonable." The statute that creates the right of action contains no such requirement. Moreover, Rule 8 of the Federal Rules of Civil Procedure only requires a short and plain statement of the claim. *See* Fed.R.Civ.P. 8.

■■■ Thiokol also argues that the allegations of the Complaint themselves establish that the government is exercising its primary jurisdiction with respect to the Rockaway Site, barring the ERA action. Thiokol argues that "[b]ecause investigative and enforcement activities by DEPE and EPA have been ongoing since 1982 in the Borough Well Field and continues [sic] to this day, the Borough's claim under the ERA is not ripe" and must be dismissed. Thiokol. Br. at 25. I disagree. Although the Complaint does allege that the EPA and DEP have taken various investigatory steps over the course of over ten years, this alone does not bar an action by Rockaway. A private plaintiff is not precluded from bringing an action merely because a governmental agency has taken *some* action with respect to the matter. Nor must Rockaway wait until the completion of all activity by the government. Rather, the ERA may be used as a *supplement* to actions taken by the government. *Frola*, 730 F.Supp. at 636; *Ironbound Health Rights Advisory Com'n v. Diamond Shamrock Chem. Co.*, 216 N.J.Super. 166, 174, 523 A.2d 250 (App.Div.1987); *see also* N.J.S.A. § 2A:35A–12 (ERA "shall be in addition to existing administrative and regulatory procedures provided by law."). In other words, although the government may have primary jurisdiction, it does not have exclusive jurisdiction. Thus, where the government takes some action, but seeks "less than full relief available under relevant legislation ... there is a clear right granted to other 'persons' to seek such relief under the Environmental Rights Act." *Howell*, 207 N.J. at 96, 504 A.2d 19; *Superior*, 216 N.J.Super. at 61, 522 A.2d 1025 ("private cause of action may still lie if the effort provided by DEP enforcement proves insufficient"); *Port of Monmouth*

*Dev. Corp. v. Middletown Township*, 229 N.J.Super. 445, 451, 551 A.2d 1030 (App. Div.1988) (ERA action permitted where DEP has "failed to act effectively"), *cert. denied*, 115 N.J. 59, 556 A.2d 1206 (1989).

Ultimately, whether the government's efforts have been sufficient and whether Rockaway's ERA action should be allowed to proceed is a fact-specific question which is inappropriate for resolution at the pleading stage. As the court stated in *Howell*, "there is no *per se* rule which will serve as an appropriate solution to all situations which may be posited. Rather, the solution lies within the framework of the individual set of facts in each case." 207 N.J.Super. at 95, 504 A.2d 19 (remanding case to trial court to determine whether DEP had adequately enforced environmental laws). Although it may appear after discovery that the ERA claim should not proceed, a motion to dismiss the ERA count is premature at this time.

For these reasons, Rockaway's claim under the ERA will not be dismissed.

### C. Motion to Dismiss Cross–Claims of Klockner

#### 1. Cross–Claims under Spill Act, Solid Waste Management Act, and Water Pollution Control Act

Counts II, III and IV of Klockner's Cross-claim are brought pursuant to the ERA. Specifically, Klockner alleges that Thiokol, among others, violated the Spill Act, the Solid Waste Management Act, and the Water Pollution Control Act by discharging hazardous substances at the Klockner Property that allegedly contaminated the Rockaway Well Field. Cross-claim at ¶¶ 61–79. Klockner seeks to enforce compliance with these three statutes pursuant to the ERA in connection with the pollution located at both the Rockaway Well Field and the Klockner Property. *Id.*

Thiokol has moved to dismiss these three counts on the ground that they are not ripe. Specifically, it contends that because the EPA and DEP have been conducting investigations and proposing remedial plans with respect to the Rockaway site, the EPA and DEP are exercising their primary jurisdiction. Moreover, Thiokol points out that there are no allegations that the actions taken by the government are arbitrary, capricious or unreasonable. Thiokol is essentially making the same argument it made in its motion to dismiss the ERA count of Rockaway's Complaint.

█ In its Reply Memorandum of Law, however, Thiokol asserts, for the first time, an additional ground for dismissal of Klockner's ERA claims.[16] It contends that, under CERCLA, the court lacks subject matter jurisdiction to review the actions of the EPA until the EPA files a lawsuit under Sections 106 or 107 of CERCLA. *See* 42 U.S.C. § 9613(h). Section 113(h) provides:

> No Federal court shall have jurisdiction under Federal law.... to review any challenges to removal or remedial action selected under [section 104], or to review any order issued under [section 106(a)] in any action ... except [an action under Sections 106, 107 or 159].

42 U.S.C. § 9613(h). Section 113(h) essentially bars pre-enforcement judicial review of EPA actions.

█ Thiokol's argument based on Section 113(h) is misplaced. All the cases involving dismissal under Section 113(h) involve actions brought *against the EPA* in which the plaintiff sought to enjoin or otherwise challenge a remedy pursued by the EPA. Such is not the case here. Klockner is not seeking to challenge any remedial or removal action taken by the EPA. Rather, Klockner seeks to enforce particular New Jersey state statutes under the ERA against private parties. Thus, even if a "review" of the EPA's actions were eventually necessary to determine whether an ERA action could proceed against the defendants, this would not be a challenge to the EPA's activities as such, but rather a determination of whether a private action could proceed against the defendants. I do not read Section 113(h) as preventing a court from making an ancillary determination about the extent of involvement of

---

**16.** Thiokol asserts that this argument applies equally to Rockaway's ERA count.

state and/or federal agencies in order to decide whether an ERA action can proceed. *See generally Manor Care, Inc. v. Yaskin,* 950 F.2d 122, 127 (3d Cir.1991) ("Congress did not intend for CERCLA remedies to preempt complementary state remedies").

Moreover, the purpose of Section 113(h) is "to prevent time-consuming litigation from delaying the prompt clean-up of these sites." *Boarhead Corp. v. Erickson,* 923 F.2d 1011, 1019 (3d Cir.1991). As the Third Circuit has observed, one goal of CERCLA was to permit the EPA to "respond expeditiously to serious hazards without being stopped in its tracks by legal entanglement before or during the hazard clean-up." *Id.* Here, the EPA is not a party to any action and there is no danger of any "legal entanglement" that might delay its activities in connection with the Rockaway Well Field.[17]

For these reasons and the reasons discussed above with reference to Rockaway's ERA count, *see* Part II.B.5, Thiokol's motion is denied as to Counts II, III, and IV.

2. *Claims for Private Nuisance, Public Nuisance, Negligence, Fraudulent Concealment, Waste of Property, Trespass, and Unjust Enrichment*

■ Counts V, VI, VIII, X, XVI, XVII and XVIII allege claims for private nuisance, public nuisance, negligence, fraudulent concealment, waste of property, trespass, and unjust enrichment. Thiokol seeks to dismiss these claims for the sole reason that they "parrot" Count VII, which alleges a claim for strict liability. As it did in its motion to dismiss similar common law claims set forth in Rockaway's Complaint, Thiokol alleges that the claims sought to be dismissed seek identical relief and are based on the same factual predicate as the strict liability claim, thereby warranting dismissal of the "duplicative" counts.

For the reasons discussed in Part II.B.4, relating to the dismissal of Rockaway's counts, Thiokol's motion is denied as to

Counts V, VI, VIII, X, XVI, XVII and XVIII.

3. *Claim for Public Nuisance*

■ Thiokol argues that Klockner's claim for public nuisance (Count VI) should be dismissed on a second ground, that is, that Klockner has failed to plead any facts entitling it to relief.

■ Under New Jersey law, a public nuisance consists of an unreasonable interference with the exercise of a right common to the general public. *PPG,* 655 F.Supp. at 1265; *Mayor & Council of Borough of Alpine v. Brewster,* 7 N.J. 42, 50, 80 A.2d 297 (1951); *see also* Restatement (Second) of Torts [hereinafter Restatement], § 821(B)(1). A plaintiff has standing to assert a claim of public nuisance only if it has suffered "special injury." To meet the "special injury" requirement, the plaintiff "must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." *Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 315 (3d Cir.) (*quoting* Restatement, § 821C(1)), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *PPG,* 655 F.Supp. at 1265 (plaintiff has standing "only if it has sustained 'special damage over and above that suffered by the general public'") (*quoting Howell,* 207 N.J.Super. at 99, 504 A.2d 19). In its Cross-claim, Klockner alleges that the discharge of waste by its tenants "has substantially interfered with the use and enjoyment of the groundwater beneath the Klockner Property, and has potentially interfered with the use and enjoyment of the Borough Wellfield by the public to the damage and detriment of the members of the public." Cross-claim at ¶ 84. It also alleges that it has sustained substantial business losses as a result of the contamination of its property. *Id.* at ¶ 36.

---

17. Finally, on the record before me, it is unclear whether Section 113(h) is applicable for another reason. Under Section 113(h), federal courts are denied jurisdiction to review challenges to a removal or remedial action selected under Sec-

tion 104, or any order issued under Section 106(a). On the record as it now exists on this motion to dismiss, it is unclear whether the EPA has taken either such action.

The Third Circuit has specifically addressed a public nuisance claim against a successor landowner. *See Hercules*, 762 F.2d at 315. In *Hercules*, it admonished:

> In analyzing the public nuisance claim, we are not concerned with the happenstance that [the plaintiff] now occupies the very land [the prior owner] occupied when it allegedly created the condition that has polluted the ... waters, or that the continuing source of that pollution is located on that land. The question before us is whether [the plaintiff] has *standing* to bring an individual action for damages or injunctive relief for interference with a public right.

*Id.*

I find that Klockner has sufficiently alleged a claim for public nuisance. In its Cross-claim, Klockner alleged interference with a public right, that is, the right of all members of the community to uncontaminated water from the Rockaway aquifer. *See id.* at 316 (right to "pure water" is a public right). Klockner has also adequately alleged special injury, that is, that it has been deprived of the use and enjoyment of that portion of the aquifer located beneath its property. Because it alleged interference specifically with that portion of the aquifer located beneath its property, it has alleged an injury different from that suffered by the public in general. Moreover, Klockner sustained harm in the exercise of a right common to the general public since it does not have a proprietary interest in the groundwater located beneath its property. *See Woodsum v. Pemberton Township*, 172 N.J.Super. 489, 502, 412 A.2d 1064 (Law Div.1980), *aff'd*, 177 N.J.Super. 639, 427 A.2d 615 (App.Div.1981).

Moreover, the Third Circuit has recognized that injury to a business operation as a result of pollution may constitute special injury. *See Hercules*, 762 F.2d at 316 (special injury "where an established business made commercial use of the public right with which the defendant interfered") (*quoting* Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997, 1013–14 (1966)). Here, Klockner has alleged that it has suffered and continues to suffer substantial business losses as a result of Thiokol's contamination of the aquifer located beneath the Klockner Property.

Thiokol relies on *Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 809 (D.N.J.1989), and *Hercules* for its argument that a subsequent landowner cannot recover under a public nuisance theory for damages sustained by a predecessor occupant. However, its reliance on these two cases is misplaced. In both cases, the plaintiff sought to recover its costs of cleaning up its property. This was held insufficient to support a public nuisance claim since the harm was not sustained in the exercise of a right common to the general public. *Hercules*, 762 F.2d at 316. Here the harm allegedly sustained, interference with Klockner's use of the aquifer located beneath its property and the resulting harm to its business, was harm sustained in the exercise of a public right, *i.e.*, the right to uncontaminated water from the aquifer.

Because Klockner has sufficiently alleged the elements of a public nuisance claim, Thiokol's motion to dismiss this count is denied.

### 4. *Claim for Private Nuisance*

 Count V alleges a claim for private nuisance. According to the Cross-claim, Thiokol was a tenant on the Klockner Property from 1949 to 1970. Klockner alleges that Thiokol's activities on the property while it was a tenant constitute a private nuisance to Klockner. Thiokol seeks to dismiss this claim on the ground that private nuisance is unavailable to a successor landowner.

 Under New Jersey law, a private nuisance consists of an interference with one's interest in the private use and enjoyment of land. *PPG*, 655 F.Supp. at 1264 (*citing Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 N.J. 582, 591–92, 449 A.2d 472 (1982)). Private nuisance, however, applies only to interference with use of *adjoining* land. *Amland*, 711 F.Supp. at 808. In other words, private nuisance is confined to situations where one person's property use interferes with another's use of neighboring

or adjoining property. *Id.* at 807 (*citing* Restatement, § 822, comment g); *see Hercules,* 762 F.2d at 314 (noting "historical role of private nuisance law as a means of efficiently resolving conflicts between *neighboring,* contemporaneous land uses."); *Ventron,* 94 N.J. at 489, 468 A.2d 150 (noting traditional rule that nuisance involves interference with neighboring land); *Sarnicandro v. Lake Developers, Inc.,* 55 N.J.Super. 475, 481, 151 A.2d 48 (App.Div.1959) (private nuisance claim will not lie where no interference with adjoining land); *see also Frola,* 730 F.Supp. at 634 ("the New Jersey courts and this Court, when applying New Jersey law, have adhered to a narrow application of private nuisance theory ..."). Thus, a successor landowner is precluded from asserting a public nuisance claim against a predecessor landowner.

Klockner contends, however, that the principle set forth above applies only to successive landowners, and does not apply to the landlord-tenant situation. It argues that at the time of the alleged contamination, Klockner held title to the Klockner Property. Thus, it reasons that any contamination by Thiokol while it was a tenant on the Property "interfered with Klockner's contemporaneous use and enjoyment of its property, which continues today." Klockner Br. at 22–23. I disagree. As noted above, the rule in New Jersey is that a claim for private nuisance requires an interference with *adjoining* land. Moreover, this rule has been applied in the landlord-tenant situation. *See Frola,* 730 F.Supp. at 634. Finally, Klockner has provided no reason why a different rule should apply to a landowner-tenant situation and has not cited a single case in support of its position.[18]

Because private nuisance is unavailable to Klockner under the circumstances alleged in its Cross-claim, Count V must be dismissed for failure to state a claim.

**5. Claim for Unjust Enrichment**

■ Count XVIII alleges a claim for restitution and unjust enrichment. Klockner alleges that it has incurred response costs for investigating and partially remediating the contamination on the Klockner Property in order to obtain ECRA clearance to sell the Property, and that Thiokol has been unjustly enriched because Klockner alone has incurred these clean-up costs. Cross-claim at ¶¶ 27, 33–36.

■ There are two elements of a claim for unjust enrichment: 1) that the plaintiff received a benefit; and 2) an injustice would result if the plaintiff retained the benefit without paying for it. *Associates Commercial Corp. v. Wallia,* 211 N.J.Super. 231, 243, 511 A.2d 709 (App.Div.1986); *Callano v. Oakwood Park Homes Corp.,* 91 N.J.Super. 105, 108, 219 A.2d 332 (App. Div.1966).

Thiokol alleges that because Klockner had a legal obligation to investigate and clean up its property in order to obtain ECRA clearance, Klockner did not confer any benefit on Thiokol when it took action on its property. It asserts that because there has been no enrichment, Klockner's claim must be dismissed. I agree.

As noted above, Klockner alleges that it incurred the costs in order to obtain clearance under ECRA so that it could sell its property. Once Klockner decided to sell its property, it triggered obligations under ECRA. *See Superior,* 216 N.J.Super. at 64, 522 A.2d 1025. "The transfer triggers ECRA, imposing a regulatory obligation on the current owner before transfer to develop, and, if necessary, to implement a clean-up plan. This obligation proceeds without regard to responsibility for the contamination itself." *Id.* Thus the costs Klockner incurred were the result of its own decision to transfer its property. Clearly, under these circumstances, no benefit was conferred upon Thiokol.

The reasoning of *Smith Land & Improvement Corp. v. Rapid–American*

---

**18.** Klockner argues that the determinative factor in public nuisance cases is whether the use of the land and the interference are contemporaneous. Even if that were true, in this case, Thiokol is no longer using the Klockner property so as to be contemporaneously interfering with Klockner's use and enjoyment of its property.

*Corp.* is pertinent here. 26 Env't Rep.Cas. (BNA) 2023, 1987 WL 56461 (M.D.Pa.1987), *vacated on other grounds, Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). In that case, the plaintiff sought reimbursement from the prior owner of contaminated property for the costs it incurred when it was required by the EPA to clean up the property. The court stated:

> just because the EPA chose the plaintiff to do the clean-up work, does not mean that the defendant was enriched. The plaintiff continually argues that the defendant was spared the clean-up costs. Yet the plaintiff fails to realize that it was equally responsible to clean up its land.

*Id.* at 2026.[19]

The facts before me present an even stronger case than in *Smith Land*. In *Smith Land*, both the plaintiff and defendant were equally responsible to clean up the property under CERCLA. Here, only Klockner had an obligation under ECRA to clean up the Property in order to obtain clearance for the contemplated sale.[20]

I therefore find that Klockner's claim for unjust enrichment fails to state a claim for relief and must be dismissed.

### 6. *Claim for Fraudulent Concealment*

■ Count X of Klockner's Cross-claim sets forth a claim for fraudulent concealment. Thiokol moves to dismiss this count on the ground that Klockner has not complied with the special pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

The purpose of Rule 9(b) is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Under Rule 9(b), a plaintiff must plead fraud with particularity. Rule 9(b) states, in relevant part:

> In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The Third Circuit has held that "focusing exclusively on [Rule 9(b)'s] particularity language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Seville*, 742 F.2d at 791 (*quoting Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983)). Rule 9(b) must be interpreted alongside Rule 8(f), which requires a court to construe pleadings "as to do substantial justice." *Id.*

Accordingly, "while allegations of date, place or time fulfill [Rule 9(b)'s] functions, ... nothing in the Rule requires them." *Id.* Rather, "[p]laintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

More recently, the Third Circuit again addressed the standard for pleading fraud under Rule 9(b) in *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 285 (3d Cir.), *cert.*

---

**19.** Klockner attempts to distinguish *Smith Land* on the ground that in that case, successive landowners were involved. The Court in *Smith Land* stated that there was no injustice in preventing the successor landowner from recovering from the predecessor landowner in that case because the contamination was obvious at the time of the sale of the property and there was no attempt to conceal the contamination. *Id.* at 2026. However, this was clearly an alternative ground for the Court's holding. In dismissing the unjust enrichment claim, the Court primarily relied on the fact that no benefit had been conferred since the plaintiff was equally responsible for clean up of the property under CERCLA.

**20.** In addition, Klockner alleges in its Cross-claim that there has been a release of hazardous substances on its Property and that it has incurred response costs as defined by CERCLA. As the current owner of the Property, it is jointly and severally liable for all such response costs incurred pursuant to Section 107 of CERCLA. 42 U.S.C. § 9607. As such, it has a legal obligation to clean up the property, and therefore cannot be said to have conferred a benefit upon Thiokol by undertaking clean-up of the property. *See Smith Land* at 2026.

*denied,* —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). The Court held that when information necessary to plead fraud with particularity is exclusively within the defendants' control, a plaintiff may survive a motion to dismiss by specifically alleging that defendants have exclusive control over the information required. The plaintiff must accompany its allegation with a statement of facts upon which the allegation of fraud is based and delineate the nature and scope of its efforts to obtain the information needed to plead fraud with particularity.

In its Cross-claim, Klockner alleges that while Thiokol was a tenant on the Property it contaminated the Property and that it failed to remove the underground tanks containing hazardous wastes upon its departure. Cross-claim at ¶¶ 21, 107. It also alleges that the defendants, as Klockner's tenants, knew or should have known of the contamination they caused during their leaseholds, *id.* at ¶ 98, that defendants "deliberately and fraudulently failed to disclose" to Klockner the existence of the contamination and that Klockner justifiably relied on this nondisclosure. *Id.* at ¶ 99.

▮ Applying the principles set forth above to the allegations of the Cross-claim, I find that Klockner has not pled its claim with sufficient particularity. To begin with, Klockner has not particularized in any way its allegation of fraudulent concealment. It simply makes a blanket statement that the defendants "deliberately and fraudulently failed to disclose" the contamination. Klockner has essentially pled the elements of a claim for fraudulent concealment without describing any factual predicate supporting each element. In other words, it is impossible to tell from the count what the underlying facts are that gave rise to the alleged acts of fraudulent concealment. Although it is not necessary to plead the date, place or time of the acts of fraudulent concealment, the plaintiff must nevertheless provide some factual substantiation of its allegations of fraud. Klockner has not done so here.

▮ Moreover, Klockner has grouped all the defendants together in its count for fraudulent concealment without specifying the precise misconduct associated with each defendant. · Klockner cannot simply "lump" all the defendants together and allege· generally that they all committed fraudulent concealment. Where multiple defendants are charged with fraudulent concealment, "the complaint must inform each defendant of the specific fraudulent acts which constitute the basis of the action against the particular defendant." *Coronet Ins. Co. v. Seyfarth,* 665 F.Supp. 661, 666 (N.D.Ill.1987).[21]

Klockner argues, however, that it has separately stated the wrongful activities in which each defendant engaged, albeit not within the count itself. For example, Paragraph 21 of the Cross-claim states that Thiokol discharged hazardous substances at the Klockner Property. This argument is misplaced, however. The acts Klockner has separately alleged as to each defendant are not the acts that constitute the fraudulent concealment; rather Klockner has separately alleged the acts of pollution. However, it is the acts of fraud forming the basis of the fraudulent concealment claim that need to be particularized. *See Coronet,* 665 F.Supp. at 666 ("complaint must inform each defendant of specific *fraudulent* acts") (emphasis added).

Finally, Klockner has not delineated its attempts to investigate the action to be able to plead fraud with more particularity and has not alleged that necessary information is within the defendants' exclusive control.

Therefore, in light of the above, I find that Klockner simply has not pled this count with the specificity required by Rule 9(b). The claim as it now stands will be dismissed without prejudice. However, this court will stay the dismissal for thirty days from the date of this Order to allow Klockner to amend its claim if it so chooses

---

**21.** Although *Coronet* is not from the Third Circuit, I find that the principle articulated in that case nevertheless reflects the law in the Third Circuit, which requires that the plaintiff inject some precision and substantiation into its fraud claim. *See Seville,* 742 F.2d at 791.

in accordance with the principles set forth above. *See Saporito v. Combustion Engineering Inc.*, 843 F.2d 666, 675 (3d Cir. 1988) (leave to amend should be granted in order to allow the pleader an opportunity to provide greater specificity), *vacated on other grounds*, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989).

### 7. *Claim of Contribution*

■ Count XX alleges a claim for contribution for past and future costs which Thiokol, as the alleged actual tortfeasor, caused Klockner to incur. Cross-claim at ¶¶ 155–156. The count is labeled as "Common Law Contribution."

Thiokol argues that no common law contribution right of action exists under New Jersey law. Rather, the right to contribution is governed exclusively by the New Jersey Joint Tortfeasors Act, N.J.S.A. 2A:53A–1, *et seq.* Thiokol argues that Klockner has not alleged a cause of action under the Tortfeasors Act, and therefore Count XX fails to state a claim for relief.

In its opposition papers, Klockner concedes that there is no common law right to contribution in New Jersey and that it made a mistake by labelling the claim as a common law claim. I find that this mistake is not fatal to the count.[22] *See Alexander v. Unification Church of America*, 634 F.2d 673, 678 (2d Cir.1980) (mislabelling of count is immaterial under Federal Rules of Civil Procedure). Rule 8 of the Federal Rules merely requires a pleading to give the defendant fair notice of the claims asserted against it. *See Conley*, 355 U.S. at 47, 78 S.Ct. at 103. I find that the allegations of the Cross-claim provide Thiokol with fair notice that Klockner is seeking a claim for contribution. There is no requirement that the count specifically refer to the statutory basis for the action as long as the allegations otherwise give fair notice.

I therefore find that the Count XX states a claim for relief for contribution under the Tortfeasors Act and will deny Thiokol's motion to dismiss this count.

### Conclusion

For the foregoing reasons, I grant Thiokol's motion to dismiss Rockaway's Complaint for failure to state a claim as to Count I (CERCLA claim as to injunctive relief) and Count II (CERCLA natural resource damage claim).[23] I also grant Thiokol's motion to dismiss Klockner's Cross-claim as to Count V (private nuisance); Count XVIII (unjust enrichment); and Count X (fraudulent concealment). With respect to Count X (fraudulent concealment), however, Klockner will have 30 days from the date the Order is signed to amend this count.

---

22. In its Reply papers, Thiokol states that it is willing to accept Klockner's representation that it mistakenly labelled the count, provided that the parties enter into a consent order stating that Count XX states only a claim for contribution under the Tortfeasors Act. The parties have not done so, but my disposition of this part of the motion to dismiss will have the same result.

23. The motion of Masden and Multi–Form, who joined in the Thiokol's motion to dismiss except as to Count II, is granted as to Count I.